IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VISION TECHNOLOGY DESIGN & MANUFACTURING, INC., | ) ) ) | No. CV-F-07-412 OWW/WMW |
| | ) ) ) | MEMORANDUM DECISION GRANTING IN PART WITH LEAVE TO AMEND AND DENYING IN PART |
| Plaintiff, | ) ) | DEFENDANT'S MOTION TO DISMISS (Doc. 7) |
| vs. | ) ) ) | |
| GENERAL WIRE SPRING COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

Before the Court is Defendant General Wire Spring Company's motion to dismiss the Complaint for Damages and Declaratory Relief filed by Plaintiff Vision Technology Design & Manufacturing, Inc. on March 14, 2007.  Defendant moves for dismissal or transfer for improper venue pursuant to Rule 12(b)(3), Federal Rules of Civil Procedure, and for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure.

    A. <u>ALLEGATIONS OF COMPLAINT</u>.

1

The Complaint alleges that Vision Tech is in the business of manufacturing sewer line cameras, sewer line leak detectors and other similar products.  General Wire is alleged to be a distributor and seller of sewer line maintenance and inspection products, including sewer line cleaners, cameras and leak detectors, who sells its products to individuals and businesses in the plumbing industry.  The Complaint further alleges:

> 8.  In 2002, Vision Tech and General Wire entered into a business relationship wherein General Wire agreed that it would exclusively purchase from Vision Tech all of General Wire's requirements for certain sewer line inspection and maintenance products.  That business relationship continued until mid-2006.
>
> 9.  Before General Wire began to use Vision Tech as its exclusive manufacturer, General Wire used another manufacturer.  When General Wire chose to use Vision Tech as its manufacturer, General Wire requested that Vision Tech change the appearance of Vision Tech's pre-existing products to mimic the appearance of General Wire's products. General Wire asserted that the purpose for this request was to facilitate the transition between the prior manufacturer and Vision Tech and to ensure that repair parts would be compatible.  Vision Tech incurred various costs to accommodate General Wire's needs, including without limitation hiring professionals to redesign its products, create molds and drawings of General Wire's housings, and other actions, all in order to manufacture products to match General Wire's exclusive needs.
>
> 10.  In connection with their business relationship, General Wire loaned Vision Tech approximately $400,000.  That loan was secured by a chattel mortgage on Vision Tech's inventory, and was repaid in fully in August 2006.

2

11.  In or about September 2002, General Wire began ordering products from Vision Tech. The course of dealing between the parties was that General Wire would issue written purchase orders to Vision Tech approximately six (6) months in advance of General Wire's requested ship date for those products.  The parties also agreed upon prices for these products in advance, which prices changed from time to time by mutual agreement.

12.  General Wire also regularly provided Vision Tech with sales projections for the three (3) to six (6) months that followed, so that Vision Tech could order and have on hand sufficient quantities of component parts for the manufacture of General Wire's products. Vision Tech did in fact pre-order these components from its vendors pursuant to General Wire's sales projections.  Most of the components had to be specially manufactured by Vision Tech's vendors, because they contained General Wire's logo, product name, specific product color scheme, and other General Wire-specific features.

13.  Vision Tech and General Wire also agreed that Vision Tech would give volume discounts for certain products if, in a particular twelve-month period, General Wire ordered at or above a minimum number of these certain products.  Not all products had volume discounts, and no discount applied to any product where General Wire's monthly purchases for that product did not meet or exceed the minimum monthly amount.

14.  Beginning in September 2005, General Wire sent sales projections and purchase orders to Vision Tech for delivery of products during the months of November 2005 through August 2006.  After receiving these sales projections and purchase orders, Vision Tech ordered sufficient parts from its vendors to manufacture General Wire's products, and where a purchase order was issued, began manufacturing products per General Wire's purchase orders.

15.  However, beginning in May 2006, General Wire stopped making payments to Vision Tech

3

on products that it had ordered, including in some cases products that Vision Tech had already manufactured and shipped to General Wire.

16. Also commencing in May 2006, General Wire told Vision Tech not to ship any more products, despite the fact that Vision Tech had manufactured such products pursuant to General Wire's purchase orders.

17. At the time General Wire ceased making payments and accepting shipments, General Wire knew that Vision Tech had ordered components from its vendors according to General Wire's sales projections.  In some cases, Vision Tech was able to cancel its orders for these components.  In other cases, however, Vision Tech was unable to cancel orders from its vendors.  Where Vision Tech was able to cancel its component orders from its vendors, Vision Tech incurred cancellation fees.  Where Vision Tech was unable to cancel its component orders, Vision Tech was forced to purchase hundreds of thousands of dollars worth of components, many of which were specially manufactured with General Wire's name, the name of General Wire's products, and/or General Wire-specific characteristics.

18. General Wire's failure and refusal to pay for products Vision Tech had manufactured, and General Wire's unwillingness to make further manufacturing orders based on General Wire's prior sales projections, was the proximate cause of severe financial damage to Vision Tech.

19. Following the termination of the exclusive supplier relationship between Vision Tech and General Wire, Vision Tech designed and created new products for sale under its own name, including its Intruder and Intruder Elite (formerly ProCam) video inspection units.  Vision Tech began to market these products to the public in or around February 2007.

20. By letter dated March 2, 2007, General Wire, through its attorney, demanded that

4

Vision Tech 'cease and desist from ...
designing, manufacturing and promoting' its
Intruder and Intruder Elite products.  A true
and correct copy of General Wire's cease and
desist letter is attached to this Complaint
as Exhibit A.

21.  In its demand letter, General Wire
asserts: 'As a result of both the
similarities with products and components of
General Wire and the attendant confusion in
the marketplace created by Vision Tech's
promotional efforts, we have discovered the
following: (1) Vision's ProCam closely
resembles General Wire's Gen-Eye Junior; (2)
Vision's ProCam includes, as component parts,
two custom springs that were specially
designed and manufactured by General Wire for
use in a General Wire product and for which
Vision never received licensing from General
Wire or in any way paid for the use of the
same; (3) Vision's ProCam includes a custom
General Wire-developed instruction label on
the inside cover of command module cover
door; (4) the drum, with the exception of a
slight color modification and name change, is
identical to the drum used in General Wire's
Gen-Eye Junior; (5) Vision is using a command
module that was developed in accordance with
custom specifications generated by General
Wire following significant time involvement
and investment in the development, trouble
shooting, and direction of the product by
General Wire.'

22.  General Wire further contends in its
cease and desist letter that Vision Tech 'is
violating state and federal law, including,
but not limited to, federal copyright law.'

23.  The allegations contained in General
Wire's cease and desist letter are false.
Vision Tech and its agents designed the
custom springs, instruction label and command
module.  General Wire has no proprietary
rights in Vision Tech's Intruder or Intruder
Elite products or any of their component
parts.

24.  There is no likelihood of confusion
between Vision Tech's products and General

1          Wire's products.

2          **25.  No actionable infringement or dilution**
           **claim arises from Vision Tech's promotion and**
3          **sale of its Intruder and Intruder Elite**
           **products.**
4
           **26.  No unfair competition claim arises from**
5          **Vision Tech's promotion and sale of its**
           **Intruder and Intruder Elite products.**
6
   Based on these general allegations, the Complaint alleges the
7
   following causes of action:
8
           1.  First Cause of Action - breach of contract - breach of
9
   exclusive requirements contract;
10
           2.  Second Cause of Action - breach of contract - breach of
11
   purchase orders;
12
           3.  Third Cause of Action - promissory estoppel;
13
           4.  Fourth Cause of Action - unjust enrichment;
14
           5.  Fifth Cause of Action - common count - goods sold and
15
   delivered;
16
           6.  Sixth Cause of Action - declaratory judgment.
17
       B.  <u>MOTION TO DISMISS OR TRANSFER FOR IMPROPER VENUE</u>.
18
           In moving to dismiss the Complaint for improper venue,
19
   General Wire relies on the forum selection clause in its purchase
20
   orders:
21
           **19.  LAW GOVERNING - Any contract resulting**
22         **from acceptance of this offer shall be**
           **governed by the laws of the Commonwealth of**
23         **Pennsylvania.  Venue for any suit by Seller**
           **shall be in and only in the Pennsylvania**
24         **state court of proper jurisdiction in**
           **Allegheny County, Pennsylvania, or the United**
25         **States District Court for the Western**
           **District of Pennsylvania.**
26

                                      6

(Exh. 1 to Motion to Dismiss).

Rule 12(b)(3) provides that the defense of improper venue may be asserted by pre-trial motion. A motion to dismiss for improper venue based on a forum selection clause is properly based on Rule 12(b)(3). *See Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996). In resolving such a motion, the pleadings need not be accepted as true and the court may consider facts outside of the pleadings. *Murphy v. Schneider National, Inc.*, 349 F.3d 1224, 1229 (9th Cir. 2003). In resolving a Rule 12(b)(3) motion based upon a forum selection clause, the district court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party. *Murphy, id.*

A forum selection clause is "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). The party challenging the forum selection clause bears a "heavy burden of proof" and must "clearly show" that enforcement would be unreasonable. Id. at 15. As explained in *Murphy, supra*, 349 F.3d at 1231-1232:

> Even though Bremen created a presumption in favor of enforcing forum selection clauses, Bremen recognized three reasons that would make enforcement of a forum selection clause unreasonable: (1) 'if the inclusion of the clause in the agreement was the product of fraud or overreaching'; (2) 'if the party wishing to repudiate the clause would effectively be deprived of his day in court were the clause enforced'; and (3) 'if enforcement would contravene a strong public

7

policy of the forum in which suit is
brought.' ....

Vision Tech argues that this motion should be denied for
several reasons.

First, Vision Tech contends, the evidence of the forum
selection clause attached as Exhibit 1 to the motion to dismiss
is a blank purchase order form and General Wire offers no
evidence that the forum selection condition was attached to each
of the purchase orders sent to Vision Tech.

In its reply brief, General Wire submits copies of some of
the purchase orders issued to Vision Tech during the years 2002
to 2006, all of which contain the forum selection clause.
General Wire does not submit copies of all of the purchase orders
issued to Vision Tech during these years, contending that they
are too voluminous and would be unnecessarily repetitive.

Secondly, Vision Tech argues, the forum selection clause in
the purchase orders does not govern the other disputes alleged in
its Complaint.  Vision Tech contends that its claim that General
Wire failed to pay for products shipped pursuant to the purchase
orders does not relate to its claims that General Wire induced
Vision Tech to purchase specially manufactured component parts in
order the meet General Wire's sales projections and to Vision
Tech's request for declaratory relief regarding the intellectual
property rights of the parties with respect to the Intruder and
Intruder Elite.

Vision Tech asserts that a forum selection clause need not

8

1    be enforced where only some of the claims alleged in a Complaint

2    are subject to the forum selection clause.

3        In support of this contention, Vision Tech cites three

4    cases, *Frigate Limited v. Damia*, 2007 WL 127996 (N.D.Cal.2007),

5    *Farmland Industries v. Frazier-Parrott Commodities, Inc.*, 806

6    F.2d 848 (8th Cir.1987), and *Pegasus Transportation, Inc. v.*

7    *Lynden Air Freight, Inc.*, 152 F.R.D. 574 (N.D.Ill.1993).

8        In *Frigate Limited v. Damia*, Damia established two family

9    trusts into which they placed their assets, including interests

10   in a number of convalescent hospitals located in Northern

11   California.   The trustee of the family trusts was Frigate

12   Limited, an Isle of Man company.   The trust agreements contained

13   a forum selection clause which provided that any lawsuits arising

14   under the trust agreements be submitted to the jurisdiction of

15   the High Court of the Isle of Man.   Following establishment of

16   the family trusts, Damia entered into several contractual

17   agreements with the trustee whereby the trustee gave her large

18   sums of money out of the assets of the family trusts.   When Damia

19   failed to comply with these contractual agreements, the trustee

20   filed suit against her.   Damia filed a counterclaim against the

21   trustee, including a counterclaim that the trustee breached its

22   fiduciary duty under the trust agreements.   The trustee moved to

23   dismiss this specific counterclaim pursuant to the forum

24   selection clause in the trust agreements.   In denying the motion

25   to dismiss, Judge Breyer held in pertinent part:

26            Here, the Court concludes that enforcement of

9

the forum selection clause in the Trust Agreements would be 'unreasonable under the circumstances' of this particular case. *Bremen*, 407 U.S. at 10.  If the Court dismisses Damia's counterclaim, she will be forced to litigate the case simultaneously in the Isle of Man.  Moreover, because Damia asserts the basis for the counterclaim as an affirmative defense against the trustee's claims, this Court may address and decide many of the issues presented in the counterclaim.   Under these circumstances, the instant proceedings may well have preclusive effect on any subsequent proceedings in the Isle of Man, and Damia may be effectively 'deprived of [her] day in court' as to that counterclaim.  *See Argueta*, 87 F.3d at 325.

For similar reasons, the Court also finds that the enforcement of the forum selection clause in the Trust Agreements would be contrary to sound judicial policy.  A plethora of legal rules and doctrines are designed to promote the efficient resolution of controversies.  *See, e.g.,* Fed.R.Civ.P. 18 (permitting joinder of related claims and remedies); Fed.R.Civ.P. 19 (requiring the joinder of persons needed for just adjudication of a controversy); Fed.R.Civ.P. 20 (permitting joinder); Fed.R.Civ.P. 22 (allowing interpleader for interested parties); 28 U.S.C. § 1291 (requiring a 'final order' by the district court so as to avoid piecemeal or unnecessary litigation of appeals).  Compelling Damia to litigate the same issues in a different jurisdiction halfway around the world, when this Court is adjudicating those very same issues at the trustee's own behest, is needlessly inconvenient and burdensome; requiring such duplicitous litigation is plainly contrary to the policy of the federal judiciary of promoting the consistent and complete adjudication of disputes.  To the extent that it has been deprived of the benefit of the forum selection clause in the Trust Agreements, the trustee has only itself to blame - by entering into contracts with the settlor, even though she may have been acting in a distinct and unrelated role, the trustee

10

> itself created the specter that its fiduciary
> duty under the Trust Agreements would be
> invoked in a dispute.  The trustee cannot
> enter into multiple agreements, all of which
> pertain to the same set of assets and bind
> the same parties (albeit perhaps acting in
> different roles), and then complain that they
> contain mutually incompatible forum selection
> clauses ... The trustee has identified no
> case, and this Court is aware of none, in
> which a plaintiff first filed suit and then
> successfully invoked a forum selection clause
> to exclude counterclaims as to the very same
> subject matter.

In *Farmland Industries, Inc. v. Frazier-Parrott Commodities, Inc.,* Farmland sued Frazier-Parrott alleging fraud, breach of fiduciary duty and violations of the federal securities laws and RICO.  Frazier-Parrott moved to dismiss or transfer for improper venue based on a forum selection clause.  The district court refused to dismiss because the suit was much broader than contemplated by Farmland when it signed the agreement containing the forum selection clause.  The Eighth Circuit affirmed, ruling in part:

> As to the scope of the forum selection clause
> we agree with the district court that the
> suit is broader than the clause.  The court
> found that

> > [t]his matter involves more than a
> > dispute between plaintiff,
> > Heinhold, and those associated with
> > Heinhold.  Plaintiff has alleged an
> > elaborate scheme of fraud involving
> > not only Heinhold and individuals
> > associated with Heinhold, but also
> > involving other individuals outside
> > the securities brokerages, sham
> > corporations, and other matters not
> > subject to the agreement between
> > plaintiff and Heinhold.

11

...

> The district court stated that Farmland's
> causes of action do not all arise directly or
> indirectly from the agreement and that
> Farmland could not have anticipated having to
> litigate these claims in Illinois.   The court
> also found that Farmland's multiple claims
> were not intended to evade the forum
> selection clause.   We agree.

> Defendants argue that even if we find the
> suit to be broader than the clause, the
> clause should still be enforced to the extent
> it applies.   In support of this position,
> defendants cite *Dean Witter Reynolds Inc. v.
> Byrd*, 470 U.S. 213 ... (1985).   In this case
> the court held that 'Arbitration Act [9
> U.S.C. § 1 *et seq.* (1982)] requires district
> courts to compel arbitration of pendent
> arbitrable claims when one of the parties
> files a motion to compel, even where the
> result would be the possibly inefficient
> maintenance of separate proceedings in
> different forums.' ... The court stressed the
> fact that the Arbitration Act is mandatory;
> the district court must order arbitration on
> issues covered by an arbitration agreement
> even if this involves severing a lawsuit.
> However, in the present case there is no
> mandatory federal statute.   Absent the strong
> policy of the Arbitration Act, we see no
> reason to require piecemeal resolution of
> this case.   The district court found that
> under the circumstances enforcement of the
> forum selection clause would not be
> reasonable.   We can not say that this was an
> abuse of discretion.

806 F.2d at 852.

In *Pegasus Transportation, Inc. v. Lynden Air Freight, Inc.*, Pegasus brought suit in state court against Lynden for additional tariff fees.   The district court remanded the action based upon a forum selection clause contained in Pegasus' filed tariff. Lynden moved for reconsideration of the remand based on the fact

12

1  that just over half of the shipments occurred prior to the

2  effective date of the forum selection clause.   Lynden argued that

3  the forum selection provision should not operate as a waiver of

4  the right to remove those claims and that the district court

5  should exercise supplemental jurisdiction over that portion of

6  the suit involving shipments after the effective date of the

7  forum selection clause.   The district court granted the motion

8  for reconsideration, holding in pertinent part:

> The party seeking to set aside a forum
> selection clause has a heavy burden of proof
> and absent a very strong showing of
> unreasonableness, forum selection clauses
> should be enforced.  *Carnival Cruise Lines,
> Inc. v. Shute*, 499 U.S. 585, 591-92 ...
> (1991).   Lynden has, albeit belatedly, made
> such a showing in this case.  Pegasus, as
> plaintiff, chose to include 221 claims in its
> complaint relating to periods prior to the
> effective date of the forum selection clause
> and now wishes to enforce that clause with
> respect to the remaining claims.  Over half
> of Pegasus's claims were properly removable
> by Lynden.  Pegasus could not bury them with
> post-effective-date claims, in an
> undifferentiated count, in an attempt to
> broaden the scope of the forum selection
> clause and thereby defeat Lynden's removal
> right.  Once properly removed, this court
> must exercise jurisdiction over the 211
> preeffective date claims.
>
> ... [S]imultaneously adjudicating identical
> claims in both federal and state court 'would
> be a pointless waste of judicial resources.'
> ... This court was unable to locate any cases
> involving an attempt by a defendant to avoid
> the application of a forum selection clause
> based on the overbreadth of plaintiff's
> complaint.  However, courts have held that
> where a plaintiff's suit is truly broader
> than the forum selection clause and the
> structure of the complaint is not an attempt
> to avoid the forum selection clause,

enforcement of the forum selection clause would be unreasonable. *See e.g., Farmland Indus., Inc. v. Frazier-Parrott Commodities, Inc.*, 806 F.2d 848, 852 (9th Cir.1986); *General Environmental Science Corp. v. Horsfall*, 753 F.Supp. 664, 668 (N.D.Ohio 1990). In *Farmland Indus.,* defendants made an argument similar to the one made by Pegasus. If the plaintiff's claims were indeed much broader than the applicable forum selection clause, defendants argued, the clause should be enforced to the extent it applies. 806 F.2d at 852. Rejecting this argument, the *Farmland Indus.* court stated that '[a]bsent ... strong policy [reasons (*e.g.*, a statutory requirement)], we see no reason to require piecemeal resolution of this case in two courts. *Id.*

Defendant seeks to avoid the forum selection clause and it was Pegasus that structured the complaint. Under these circumstances, enforcement of the forum selection clause by remanding less that half of Pegasus's identical claims to the state court would be unreasonable. Therefore, Pegasus's claims for shipments made after the effective date of the tariff's forum selection clause will not be remanded and the entire case will proceed in this court.

152 F.R.D. at 576-577.

General Wire argues that Vision Tech's reliance on these cases to defeat application of the purchase orders' forum selection clause is misplaced because five of the six causes of action advanced by Vision stem directly from the various purchase orders that defined the parties' relationship. General Wire further contends that the Sixth Cause of Action for declaratory relief stems indirectly from the purchase orders because, without the purchase orders, the parties would not have had a relationship. General Wire argues that Vision Tech's case

14

1     **is not broader, in terms of the time period**
2     **covered by the forum selection clause, the**
    **parties, or in any other way, than the**
3     **applicable purchase orders.  All of Vision**
    **Tech's claims relate either directly or**
4     **indirectly to the purchase orders.  Vision**
    **Tech has failed to, and cannot, demonstrate**
5     **any unreasonableness of the agreed upon forum**
    **selection clause.  Enforcement of the forum**
6     **selection clause will neither deprive Vision**
    **Tech of its day in court nor contradict sound**
7     **judicial policy.  *Frigate Ltd.* ...,**
    **Enforcement will not subject claims to the**
8     **forum selection clause which originated prior**
    **to the forum selection clause's effective**
9     **date.  *Pegasus Transp.*, 152 F.R.D. at 575.**
    **Enforcement also will not subject any**
10     **individuals or entities to the forum**
    **selection clause which were not parties to he**
11     **underlining [sic] purchase orders.  *Farmland***
    ***Indus., Inc.*, 806 F.2d at 852.**

12       **This analysis is misplaced.  Taking the Complaint's**

13 **allegations as true, Vision Tech alleges that a broader**

14 **contractual arrangement was formed, only a portion of which was**

15 **represented by purchase orders.  General Wire is alleged to have**

16 **agreed to exclusively purchase from Vision Tech all General**

17 **Wire's requirements for sewer line inspection and maintenance**

18 **products.  An additional contract, executed by part performance**

19 **that caused Vision Tech to purchase large numbers of parts to its**

20 **economic detriment, is also alleged.**

21       **The motion to dismiss or transfer this action based on the**

22 **forum selection clause is DENIED.  As Vision Tech argues, not all**

23 **of its claims are based on breach of the purchase orders and its**

24 **claim for declaratory relief as to an intellectual property**

25 **dispute is not based on a contract resulting from a purchase**

26 **order.  Because the declaratory relief claim is validly brought**

in the Eastern District of California, enforcement of the forum
selection clause is unreasonable.

C.   <u>MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON</u>
<u>WHICH RELIEF CAN BE GRANTED</u>.

General Wire moves to dismiss the six causes of action
alleged in the Complaint for failure to state a claim upon which
relief can be granted.

1.   <u>GOVERNING STANDARDS</u>.

A motion to dismiss under Rule 12(b)(6) tests the
sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729,
732 (9th Cir.2001).  Dismissal of a claim under Rule 12(b)(6) is
appropriate only where "it appears beyond doubt that the
plaintiff can prove no set of facts in support of his claim which
would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-
46 (1957).  Dismissal is warranted under Rule 12(b)(6) where the
complaint lacks a cognizable legal theory or where the complaint
presents a cognizable legal theory yet fails to plead essential
facts under that theory.  *Robertson v. Dean Witter Reynolds,*
*Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to
dismiss under Rule 12(b)(6), the court must assume the truth of
all factual allegations and must construe all inferences from
them in the light most favorable to the nonmoving party.
*Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However,
legal conclusions need not be taken as true merely because they
are cast in the form of factual allegations.   *Ileto v. Glock,*
*Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).  Immunities and other

16

affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)  When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Parrino v. FHP, Inc*, 146 F.3d 699, 705-706 (9th Cir.1988).

       3.  <u>CAUSES OF ACTION FOR EQUITABLE RELIEF</u>.

General Wire moves to dismiss the causes of action for equitable relief because the Complaint demonstrates that Vision Tech has an available remedy at law for damages and the Complaint is devoid of any allegations indicating that its remedy at law is inadequate.

Vision Tech opposes this ground for dismissal, referring to Rule 8(e)(2), Federal Rules of Civil Procedure:

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements.  A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.  All statements shall be made subject to the obligations set forth in

17

1      Rule 11.

2          In reply, General Wire asserts that, "to the extent that

3  this Court decides to treat General Wire's Motion to Dismiss as a

4  Motion for Summary Judgment, it is proper to consider Vision

5  Tech's inability to maintain, over and above its ability to

6  plead, the various causes of action asserted by Vision Tech as a

7  matter of law."  For example, General Wire contends, Vision

8  Tech's available remedy at law precludes maintenance of the

9  claims for promissory estoppel and unjust enrichment.  General

10 Wire "does not dispute Vision Tech's ability to *plead* alternative

11 theories, but rather challenges Vision Tech's ability to

12 maintain, and prevail under, these alternative theories, should

13 this Court look beyond the pleadings."

14         As noted above, in resolving a Rule 12(b)(6) motion, the

15 court may consider documents attached to the complaint and

16 documents relied upon but not attached to the complaint when

17 authenticity is not contested, and matters of which the court

18 takes judicial notice.  *Parrino v. FHP, Inc*, *supra*, 146 F.3d 699

19 at 705-706.  However, beyond this, the court may not consider

20 "matters outside the pleading" without treating the motion to

21 dismiss as one for summary judgment pursuant to Rule 56, Federal

22 Rules of Civil Procedure, and providing "all parties ...

23 reasonable opportunity to present all material made pertinent to

24 such a motion by Rule 56."  Rule 12(b), Federal Rules of Civil

25 Procedure.  No such notice has been provided.

26         Here, General Wire presents no "matters outside the

18

pleading" pertaining to damages and the sufficiency of damages. Consequently, there is no basis upon which to convert this motion to dismiss to a motion for summary judgment and no basis for dismissal under Rule 12(b)(6) for failure to state a claim.  The motion to dismiss the causes of action for equitable relief is DENIED.

        2.   <u>FIRST CAUSE OF ACTION FOR BREACH OF EXCLUSIVE REQUIREMENTS CONTRACT</u>.

     The First Cause of Action, after incorporating the general factual allegations set forth above, alleges in pertinent part:

> 28.  Vision Tech and General Wire entered into an exclusive requirements contract, which contract was partially written, partially oral and partially implied in fact. Pursuant to that contract, General Wire agreed to order and purchase its requirements of all sewer line maintenance and inspection products exclusively from Vision Tech, and Vision Tech agreed to exclusively manufacture such products for General Wire.  Pursuant to this contract, General Wire ordered products from Vision Tech generally using individual purchase orders.

> 29.  To enable Vision Tech to manufacture and ship products to meet General Wire's requirements, General Wire usually provided Vision Tech with its sales projections at least three (3) months in advance of any purchase orders.  Vision Tech would then order from its vendors the components necessary to be able to manufacture sufficient General Wire products to meet those projections.  This special manufacture took time, and could not wait to be done until Vision Tech actually received a purchase order from General Wire.  Vision Tech is informed and believes and thereon alleges that General Wire knew that it was necessary for Vision Tech to order components for General Wire's products from its vendors

in advance of Vision Tech's receipt of
General Wire's purchase orders.

30.   Pursuant to the requirements contract,
between March and August 2006 General Wire
issued purchase orders to Vision Tech for
sewer line maintenance and inspection
products.   General Wire also provided Vision
Tech with sales projections for those months,
and Vision Tech ordered from its vendors
sufficient quantities of components to be
able to manufacture General Wire's products
pursuant to those projections.

31.   Vision Tech performed its obligations
under its requirements contracts with General
Wire.   It ordered components from its vendors
pursuant to General Wire's sales projections,
commenced and completed manufacture of
General Wire products pursuant to General
Wire purchase orders, and shipped products to
General Wire pursuant to General Wire's
purchase orders.

32.   General Wire breached its requirements
contract with Vision Tech by failing to pay
for the products it had ordered from Vision
Tech and ceasing to order products from
Vision Tech, knowing that Vision Tech had
already ordered the component parts and that
General Wire was Vision Tech's only customer.

33.   General Wire had reason to know that as
a result of its conduct, Vision Tech would
suffer consequential damages including lost
profits on the sale of the goods.

34.   As a proximate result of General Wire's
breach of, and failure to perform under, the
requirements contract, Vision Tech has
suffered damages in an amount to be proven at
trial but including the principal balance of
$588,951.78 for the products manufactured,
shipped and invoiced to General Wire;
interest on open invoices at the contract
rate of 1.5 percent per month from the due
date of each invoice; hundreds of thousands
of dollars for the cost of non-reusable
component parts purchased by Vision Tech; and
lost profits.

20

a.   **Failure to Allege Breach of Exclusive Requirements Contract.**

General Wire moves to dismiss this cause of action on the ground that these allegations do not constitute a breach of an exclusive requirements contract as a matter of law.  Citing *Paramount Lithographic Plate Service, Inc. v. Hughes Printing Co.*, 2 Pa. D. & C.3d 677 (Pa.Com.Pl.1977), General Wire asserts that "conduct constituting a breach of an exclusive requirements contract entails a purchaser's failure to exercise good faith in setting its requirements or a purchaser's violating the exclusivity covenant of a particular contract."  General Wire contends that the Complaint is devoid of any allegations that General Wire engaged an alternative seller.  With regard to the allegation that General Wire was Vision Tech's only customer General Wire contends

> that even a requirements contract would not
> have prohibited Vision Tech from having
> additional customers.  Vision Tech has
> seemingly confused a requirements contract
> with an output contract, only the latter
> of which, if pled, would have prohibited Vision
> Tech from having customers in addition to
> General Wire.

In *Paramount Lithographic Plate Service*, *supra*, at 691, the Pennsylvania Court held in the context of ruling on a motion for new trial and judgment n.o.v., in pertinent part as follows:

> A requirements contract, like any other
> contract, requires the parties to carry out
> its provisions as anticipated in good faith.
> Unless there is good faith and an appropriate
> effort on the part of the seller, the buyer's
> contract is meaningless.  Whether this good

21

faith effort to carry out the terms of the
contract is to be phrased as 'due diligence'
is a semantic quibble.  Clearly, a buyer
cannot enter into a contract, induce the
seller in reliance thereon to expend money
and change his position, and then without
ever endeavoring to perform, abandon the
project.  The Uniform Commercial Code
requires a good faith effort to carry out the
contract.  This is the law of Pennsylvania
irrespective of the explicit requirements of
the UCC cases.

Vision Tech refers to the allegations in the General

Allegations Section of the Complaint and the First Cause of

Action.  Vision Tech also refers to the allegations in the Third

Cause of Action for promissory estoppel:

42.  General Wire promised Vision Tech that
it would use Vision Tech as its exclusive
manufacturer of all sewer line maintenance
and inspection products, and that it would in
good faith and on a regular basis inform
Vision Tech of its future product needs.

43.  General Wire made these promises
reasonably expecting that they would induce
Vision Tech to act in accordance with them by
performing such manufacturing tasks, altering
its products to meet the needs of General
Wire, and reorganizing its business to be an
exclusive manufacturer of General Wire's
products.

44.  Vision Tech reasonably relied upon
General Wire's promises.  It changed its
product design to suit General Wire's needs;
it ordered components, some of which were
specially manufactured, from its vendors to
manufacture General Wire's products; and it
manufactured and shipped specially
manufactured products to General Wire.

45.  Beginning in May 2006, General Wire
failed and refused to pay Vision Tech for the
products General Wire ordered.  General Wire
also failed to place further orders at or
near the level suggested by its sales

22

> projections.  Vision Tech is informed and
> believes and thereon alleges that General
> Wire's failure to order or purchase products
> from Vision Tech did not result from external
> forces beyond General Wire's control.

These allegations, Vision Tech contends, support the claim

alleged against General Wire in the First Cause of Action.

General Wire's motion to dismiss the First Cause of Action

on this ground is GRANTED WITH LEAVE TO AMEND.  The factual basis

for the alleged contractual relationship between the parties is

unclear, making it difficult to ascertain to whether that

relationship was a requirements contract, an outputs contract, or

a hybrid.  Without clarifying amendment, it cannot be determined

whether Vision Tech has stated a claim upon which relief can be

granted against General Wire.

b.  <u>STATUTE OF FRAUDS AND STATUTE OF LIMITATIONS</u>.

General Wire further moves for dismissal of the First Cause

of Action as barred by the Pennsylvania statute of frauds, citing

13 Pa.C.S.A. § 2201, which provides in pertinent part:

> (a) General rule. - Except as otherwise
> provided in this section a contract for the
> sale of goods for the price of $500 or more
> is not enforceable by way of action or
> defense unless there is some writing
> sufficient to indicate that a contract for
> sale has been made by the parties and signed
> by the party against whom enforcement is
> sought or by his authorized agent or broker.
> A writing is not insufficient because it
> omits or incorrectly states a term agreed
> upon but the contract is not enforceable
> under this subsection beyond the quantity of
> goods shown in such writing.
>
> (b) Writing confirming contract between
> merchants. - Between merchants if within a

23

reasonable time a writing in confirmation of
the contract and sufficient against the
sender is received and the party receiving it
has reason to know its contents, it satisfies
the requirements of subsection (a) against
such party unless written notice of objection
to its contents is given within ten days
after it is received.

(c) Enforceability of contracts not
satisfying general requirements. - A contract
which does not satisfy the requirements of
subsection (a) but which is valid in other
respects is enforceable:

(1) if the goods are to be
specially manufactured for the buyer and are
not suitable for sale to others in the
ordinary course of the business of the seller
and the seller, before notice of repudiation
is received and under circumstances which
reasonably indicate that the goods are for
the buyer, has made either a substantial
beginning of their manufacture or commitments
for their procurement;

(2) if the party against whom
enforcement is sought admits in his pleading,
testimony or otherwise in court that a
contract for sale was made, but the contract
is not enforceable under this provision
beyond the quantity of goods admitted; or

(3) with respect to goods for which
payment has been made and accepted or which
have been received and accepted (section
2606).

General Wire asserts that "even if the Court concluded that

a valid requirements contract was properly pled and existed, the

statute of frauds, not to mention the statute of limitations as

to the 2002 agreement, would preclude enforcement of the same."

General Wire's motion to dismiss based on the affirmative

defense of the statute of frauds is DENIED.  13 Pa.C.S.A. §

2201(c)(1), provides an exception to the statute of frauds in a

contract for specially manufactured goods where the seller, before repudiation makes a substantial beginning of their manufacture or commitments for their manufacture.   Section 2201(c)(1) arguably applies to the allegations of the Complaint and, if so, the statute of frauds defense fails.   The motion as to the statute of frauds is DENIED.

General Wire's elliptical reference to a statute of limitations affirmative defense with regard to the 2002 agreement does not compel dismissal and the motion is DENIED on this ground.   First, General Wire does not advise the court exactly which statute of limitations  applies or its duration.   Secondly, the alleged breaches of the 2002 agreement occurred in mid-2006. This action was commenced on March 14, 2007, well within any applicable statute of limitations.

### c.   CONSEQUENTIAL DAMAGES.

Vision Tech prays for consequential damages in connection with the First Cause of Action.   General Wire moves to strike this prayer for relief.

In *Sonfast Corp. v. York Intern. Corp.*, 875 F.Supp. 1088, 1096 (M.D.Pa.1994), the District Court held:

> [Consequential damages] '[d]o not arise within the scope of the immediate buyer-seller transaction but rather stem from the losses incurred by the nonbreaching party in its dealings, often with third parties, which were reasonably foreseeable by breaching party at time of contracting.' ... It is well-settled under Pennsylvania law that an aggrieved seller may not be awarded consequential damages under the Pennsylvania Commercial Code.

*See also* 13 Pa.C.S.A. § 2703:

> Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or on the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (section 2612), then also with respect to the whole undelivered balance, the aggrieved seller may:
>
> (1) Withhold delivery of such goods.
>
> (2) Stop deliver by any bailee as provided in section 2705.
>
> (3) Proceed under section 2704 (relating to right of seller to identify goods to contract notwithstanding breach or to salvage unfinished goods).
>
> (4) Resell and recover damages as hereafter provided (section 2706) (relating to resale by seller including contract for resale)).
>
> (5) Recover damages for nonacceptance (2708) or in a proper case the price (section 2709).
>
> (6) Cancel.

General Wire's motion to dismiss is GRANTED to the extent the First Cause of Action prays for consequential damages as defined by Pennsylvania law under the causes of action based solely on the purchase orders.  If the evidence establishes a broader contract, not limited to the purchase orders, it is possible that the general measure of foreseeable contract damages will apply; to this extent the motion is DENIED.

3.   <u>SECOND CAUSE OF ACTION FOR BREACH OF PURCHASE ORDERS, FOURTH CAUSE OF ACTION FOR UNJUST ENRICHMENT, AND FIFTH CAUSE OF ACTION FOR GOODS SOLD AND DELIVERED</u>.

After incorporating all preceding allegations, the Second Cause of Action for breach of the purchase orders alleges in pertinent part:

> 36.  From March through August 2006, General Wire and Vision Tech entered into express contracts under which General Wire agreed to buy from Vision Tech, and Vision Tech agreed to manufacture and sell to General Wire, certain sewer line maintenance and inspection products.  These contracts were memorialized in writing by, among other documents, purchase orders that set forth the description and quantity of products General Wire desired and an agreed price list.

> 37.  Vision Tech fully performed its obligations under these contracts.

> 38.   General Wire has breached its contracts with Vision Tech by refusing to pay for the products it ordered from Vision Tech pursuant to these contracts.

> 39.  As a proximate result of General Wire's breach of, and failure to perform under, the above contracts, Vision Tech has suffered damages in an amount not less than $588,951.78 plus interest accruing at the rate of 1.5 percent per month from the due date of each invoice.

The Fourth Cause of Action for unjust enrichment and the Fifth Cause of Action for goods sold and delivered are based on these allegations.

General Wire moves to dismiss these causes of action on the ground that the termination condition set forth in Paragraph 4 of the purchase orders precludes these claims for relief.

Paragraph 4 of the purchase orders provides:

> TERMINATION - Buyer shall have the right to terminate this Purchase Order or any part thereof at any time by written or telegraphic

27

notice or verbal notice confirmed in writing.

(a) Without cause - In case of termination by Buyer of all or any part of this Purchase Order without cause, any termination claim must be submitted to Buyer within sixty (60) days after the effective date of termination. The provisions of this subparagraph shall not limit or affect the right of Buyer to terminate this Purchase Order for cause and shall not apply to a termination with cause.

(b) For Cause - If Seller fails to make any delivery in accordance with the agreed delivery date or schedule or otherwise fails to observe or comply with any of the other instructions, terms, conditions or warranties applicable to this Purchase Order or fails to make progress so as to endanger performance of this Purchase Order or in the event of any proceedings by or against Seller in bankruptcy or insolvency or appointment of a receiver or trustee or an assignment for the benefit of creditors, Buyer may, in addition to any other right or remedy provided by this Purchase Order or by Law, terminate all or any party [sic] of this Purchase Order by telegraphic or other written notice to Seller without any liability by Buyer to Seller on account thereof.  Buyer may require a financial statement from Seller at any time during the term of this Purchase Order for the purpose of determining Seller's financial responsibility.  In the event of termination for cause, Buyer may produce or purchase or otherwise acquire supplies or services elsewhere on such terms or in such manner as Buyer may deem appropriate and Seller shall be liable to Buyer for any excess cost or other expenses incurred by Buyer.

General Wire contends that "[i]n light of, *inter alia*, quality control issues that it was experiencing with the products supplied by Vision Tech, General Wire, consistent with the plain meaning of Paragraph 4, could have terminated its relationship and cancelled certain purchase orders with Vision Tech in the

28

middle of 2006.

Vision Tech does not specifically respond to this aspect of the motion to dismiss. It its reply brief, General Wire contends that this failure constitutes a concession that dismissal of the Second, Fourth and Fifth Causes of Action for failure to state a claim upon which relief can be granted is appropriate.

Notwithstanding Vision Tech's failure to respond to this ground for dismissal, General Wire's motion is not well-taken. General Wire's position is not based solely on the plain meaning of Paragraph 4 of the purchase orders. It is also based on defensive facts, evidence of which has not been provided by General Wire. Further, even if General Wire provided evidence to support cause for the cancellation of these purchase orders, the motion before the court is for dismissal pursuant to Rule 12(b)(6). As noted, in resolving a Rule 12(b)(6) motion, the court may consider documents attached to the complaint and documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Parrino v. FHP, Inc*, *supra*, 146 F.3d 699 at 705-706. Beyond this, the court may not consider "matters outside the pleading" without treating the motion to dismiss as one for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, and providing "all parties ... reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Rule 12(b), Federal Rules of Civil Procedure. General Wire essentially requests that the court do

29

this "in an effort to both avoid subsequent, duplicative briefing efforts and resolve this litigation in an efficient manner." General Wire does not present evidence to support its version of events.

It is not clear that the purchase order termination provision is applicable to the entire contract alleged by Vision Tech.  General Wire's motion to dismiss the Second, Fourth and Fifth Causes of Action is DENIED.

4. __THIRD CAUSE OF ACTION FOR PROMISSORY ESTOPPEL__.

After incorporating all preceding allegations, the Third Cause of Action for promissory estoppel alleges in pertinent part:

> 42.  General Wire promised Vision Tech that it would use Vision Tech as its exclusive manufacturer of all sewer line maintenance and inspection products, and that it would in good faith and on a regular basis inform Vision Tech of its future product needs.
>
> 43.  General Wire made these promises reasonably expecting that they would induce Vision Tech to act in accordance with them by performing such manufacturing tasks, altering its products to meet the needs of General Wire, and reorganizing its business to be an exclusive manufacturer of General Wire's products.
>
> 44.  Vision Tech reasonably relied upon General Wire's promises.  It changed its product design to suit General Wire's needs; it ordered components, some of which were specially manufactured, from its vendors to manufacture General Wire's products; and it manufactured and shipped specially manufactured products to General Wire.
>
> 45.  Beginning in May 2006, General Wire failed and refused to pay Vision Tech for the

products General Wire ordered.  General Wire also failed to place further orders at or near the level suggested by its sales projections.  Vision Tech is informed and believes and thereon alleges that General Wire's failure to order or purchase products from Vision Tech did not result from external forces beyond General Wire's control.

46.  As a proximate result of General Wire's actions, Vision Tech has incurred damages in an amount to be proven at trial for products Vision Tech manufactured but for which General Wire has not paid Vision Tech; in purchasing components from vendors for orders that General Wire promised it would make but never did; and in cancellation costs in attempting to cancel prior orders to Vision Tech's vendors for components for General Wire's products.

47.  It would be unjust not to enforce General Wire's promises to Vision Tech. Vision Tech agreed to become General Wire's exclusive manufacturer.  Vision Tech cannot mitigate its damages because many of the components it purchased are specially manufactured and bear General Wire's product color, logos, and other General Wire-specific features.

General Wire moves to dismiss the Third Cause of Action, contending that this section of the motion to dismiss mirrors its request for dismissal of the First Cause of Action:

Whereas Vision Tech, in its first cause of action, alleges that General Wire <u>agreed to</u> exclusivity, Vision Tech, in its third cause of action for promissory estoppel, alleges that General Wire <u>promised</u> exclusivity ... Vision Tech's claim for promissory estoppel boils down to General Wire's alleged promises of exclusivity in purchasing certain products from Vision Tech and General Wire's acting in good faith in determining its corresponding 'requirements.'  Vision Tech's Complaint is devoid of any allegations that General Wire breached its promises of exclusivity and good faith in the context of its purchase and sale

31

> relationship with Vision Tech.  To the
> contrary, Vision Tech alleges that General
> Wire breached its promises of exclusivity and
> good faith merely by refusing to pay for
> certain products and ceasing to order other
> products.

General Wire's motion to dismiss the Third Cause of Action is DENIED.  The basis for dismissal is hypertechnical and based on semantics as discussed above.

>    5.   <u>SIXTH CAUSE OF ACTION FOR DECLARATORY RELIEF</u>.

After incorporating all preceding allegations, the Sixth Cause of Action alleges in pertinent part:

> 57.  As a result of General Wire's cease and
> desist letter, an actual case or controversy
> exists between General Wire and Vision Tech
> relating to Vision Tech's promotion and sale
> of its Intruder and Intruder Elite products.

> 58.  As Vision Tech is being threatened with
> an action for damages and other relief,
> Vision Tech is in need of, and entitled to, a
> judicial declaration of each party's
> respective rights and liabilities as they
> pertain to Vision Tech's continued promotion
> and sale of its Intruder and Intruder Elite
> products, pursuant to 28 U.S.C. § 2201.

General Wire moves to dismiss the Sixth Cause of Action as premature, citing *Osram Sylvania Products, Inc. v. Comsup Commodities, Inc.*, 845 A.2d 846, 848 (Pa.Super.2004): "[D]eclaratory relief should be withheld when the request for relief is an attempt to adjudicate the validity of a defense in a future lawsuit."

As Vision Tech points out, General Wire's cease and desist letter asserts that "[i]n as much as Vision's current promotional efforts are creating confusion in the marketplace, Vision is

violating state and federal law, including, but not limited to,
federal copyright law."  Vision Tech contends that these
representations require application of the Declaratory Judgment
Act, 28 U.S.C. § 2201.  Further, Vision Tech contends, the only
basis for the application of Pennsylvania law set forth in the
purchase orders is to "[a]ny contract resulting from the
acceptance of this offer."

Because General Wire cites only federal law in its reply
brief and made no argument at the hearing that Pennsylvania law
applied, General Wire concedes that federal law applies in
determining whether dismissal of the Sixth Cause of Action is
appropriate.

28 U.S.C. § 2201(a) provides that "in a case of actual
controversy within its jurisdiction ... any court of the United
States ... may declare the rights and other legal relations of
any interested party seeking such declaration, whether or not
further relief is or could be sought."

In determining whether declaratory relief can be granted, an
inquiry must be made as to whether there is a case or controversy
between the parties.  *Principal Life Ins. Co. v. Robinson*, 394
F.3d 665, 669 (9th Cir.2005); *American States Ins. Co. v. Kearns*,
15 F.3d 142, 144 (9th Cir.1994).  The requirement is identical to
the Article III's constitutional case or controversy requirement.
*Kearns*, 15 F.3d at 144.  In order for a case to be justiciable
under Article III of the Constitution, it must be ripe for
review.  *Id*.  A controversy in this sense must be definite and

concrete, touching the legal relations of the parties having adverse legal interests. *West v. Secretary of the DOT*, 206 F.3d 920, 924 (9th Cir.2000). It must be a real and substantial controversy, admitting of a specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. *Id*. The party invoking federal jurisdiction bears the burden of establishing the existence of an actual case or controversy. *See Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1228 (9th Cir.1998). The Ninth Circuit has held that something less than an "actual threat" of litigation is required to meet the "case or controversy" requirement; instead, courts must focus on whether a declaratory plaintiff has a "reasonable apprehension" that he or she will be subjected to liability. *Paramount Pictures Corp. v. Replay TV,* 298 F.Supp.2d 921, 924 (citing *Societe de Conditionnement en Aluminum v. Hunter Engineering Co., Inc.*, 655 F.2d 938, 944 (9th Cir.1981).).

Because the content of the cease and desist letter is critical to resolution of the motion to dismiss, it is quoted in full. The cease and desist letter dated March 2, 2007 is addressed by General Wire's attorney to Vision Tech's attorney. The cease and desist letter states:

> On behalf of General Wire Spring Company ('General Wire'), we are writing to place you on notice of General Wire's intention to enforce their contractual and intellectual property rights. As you know, General Wire is a supplier of products designed and manufactured for the pipe cleaning industry.

In this regard, General Wire has invested, as the Settlement Agreement on behalf of our respective clients in October, 2006, acknowledges, a great deal of time and money into the development of its products.  As a result, it is recognized in the marketplace that General Wire's products include, but are not limited to, certain identifiable pipe inspection video equipment (*e.g.*, the Gen-Eye Pipe Inspection/Location System).

We recently became aware that your client, Vision Technology Design & Manufacturing, Inc. ('Vision'), has been promoting, among other products, units that they call the ProCam Mini and Micro System and an 'Intruder' Video Inspection System in the marketplace, including at a recent Cole Publishing-sponsored trade show in Nashville, Tennessee in early February, 2007.  Further, we have learned that Vision has entered into an arrangement with Rycom Instruments, Inc. ('Rycom') to sell the ProCam either under the name 'ProCam' or some other name (*e.g.*, Pipe-Sight).  As a result of both the similarities with products and components of General Wire and the attendant confusion in the marketplace created by Vision Tech's promotional efforts, we have discovered the following: (1) Vision's ProCam closely resembles General Wire's Gen-Eye Junior; (2) Vision's ProCam includes, as component parts, two custom springs that were specially designed and manufactured by General Wire for use in a General Wire product and for which Vision never received licensing from General Wire or in any way paid for the use of the same; (3) Vision's ProCam includes a custom General Wire-developed instruction label on the inside cover of command module cover door; (4) the drum, with the exception of a slight color modification and name change, is identical to the drum used in General Wire's Gen-Eye Junior; (5) Vision is using a command module that was developed in accordance with custom specifications generated by General Wire following significant time involvement and investment in the development, trouble shooting, and direction of the product by General Wire.  We can only speculate as to what additional and similar unlawful

35

1    practices Vision may be engaged in.

2    In as much as Vision's current promotional
     efforts are creating confusion in the
3    marketplace, Vision is violating state and
     federal law, including, but not limited to,
4    federal copyright law.  Further, in as much
     as Vision's current promotional efforts are
5    'supplying, or attempting to supply, products
     attributable to and/or identifiable with
6    General Wire,' Vision is violating the
     aforementioned Settlement Agreement.  That
7    agreement, in pertinent part, provides:

8         It is expressly understood and
          agreed that Vision recognizes and
9         represents that General Wire Spring
          Company has devoted substantial
10        time, effort, and monetary
          resources to securing its products,
11        including but not limited to, its
          Gen-Eye products a competitive and
12        advantageous position in the
          marketplace.  Vision recognizes and
13        represents that it will refrain
          from supplying, or attempting to
14        supply, products attributable to
          and/or identifiable with General
15        Wire Spring Company, including, but
          not limited to, General Wire Spring
16        Company's Gen-Eye products.  Vision
          recognizes and represents that
17        General Wire Spring Company has
          contributed significant monies
18        towards the development of the Gen-
          Eye product line, including having
19        paid for a large portion of the
          molds for General Wire Spring
20        Company's Gen-Eye products.

21   Given the seriousness of this matter, we
     demand that Vision cease and desist from
22   engaging in any further misleading and
     illegal practices of designing,
23   manufacturing, and promoting products that,
     although marketed by Vision under a new name
24   (*e.g.,* ProCam), were originally developed for
     General Wire (*e.g.,* Gen-Eye Junior).  Vision
25   must refrain from infringing upon General
     Wire's intellectual property rights.  Please
26   confirm, in writing, Vision's intention to

1
2
3
4
5
6
7

comply with this demand no later than ten
business days from the date of this
correspondence.  Please be advised that if
Vision does not immediately cease and desist
from their unlawful practices, we will seek
all appropriate legal remedies, without prior
notification.  Additionally, General Wire
will treat Vision's failure to cease and
desist, as requested, as a further breach of
the aforementioned Settlement Agreement,
thereby solidifying General Wire's ability to
send correspondence, similar to this one, to
entities such as Rycom without violating the
confidentiality provision contained therein.

8
9

We thank you and look forward to your prompt
response and cooperation.

10   In *Chesebrough-Pond's, Inc. v. Faberge, Incorporated*, 666

11  F.2d 393 (9th Cir.), *cert. denied*, 459 U.S. 967 (1982), the Ninth

12  Circuit, relying on *Societe de Conditionnement en Aluminum*, *supra*

13  655 F.2d 938, ruled:

14
15
16
17
18
19
20
21

We held that the requirements of the
Declaratory Judgment Act were satisfied 'if
the plaintiff has a real and reasonable
apprehension that he will be subject to
liability ....' ... In applying, this
standard, we focused upon the position and
perceptions of the plaintiff, declining to
identify specific acts or intentions of the
defendant that would automatically constitute
a threat of litigation.  The acts of the
defendant were instead to be examined in view
of their likely impact on competition and the
risks imposed upon the plaintiff, to
determine if the threat perceived by the
plaintiff were real and reasonable.

22
23

*Societe* thus requires a flexible approach
that is oriented to the reasonable
perceptions of the plaintiff.

24  666 F.2d at 396.

25   In *E. & J. Gallo Winery v. Pernod Ricard USA, LLC,* 2006 WL

26  2849830 (E.D.Cal.2006), the defendant's motion to dismiss a

37

declaratory judgment action was denied.  In so doing, the Court
ruled in pertinent part:

> Pernod's outside patent litigation counsel
> sent Gallo a demand letter on June 20, 2006
> stating that Gallo's new packaging system
> effectively adopted an identical design
> concept and color theme as the Pernod
> packaging.  Further, Pernod accused Gallo of
> 'invading Pernod's rights' and of creating
> confusion among the two 'cooler' brands.  In
> contrast to *Shoom*, Pernod's letter includes
> specific accusations that Gallo's packaging
> constituted trademark and trade dress
> infringement in violation of the United
> States Trademark Act, 15 U.S.C. § 1051 as
> well as 'various unfair competition laws.'
>
> Pernod's letter threatened that it would 'not
> tolerate the poaching of (its) label and
> packaging.'  As a result, Gallo was given
> eight days to provide a substantive response
> to the letter and thirty days to discontinue
> use of the packaging.  In the alternative,
> Pernod would permit Gallo to use the
> packaging through September 30, 2006 so long
> as Gallo changed its packaging and
> reincorporated the black rim on its bottles
> that was present prior to 2005 (capitulation
> to the charged infringement claim).
>
> The letter was written in aggressive and
> traducing language, setting forth a strict 30
> day deadline for Gallo to cease the use of
> its beach theme and existing packaging.
> While Pernod's counsel used the term
> 'amicable resolution,' this was contingent
> upon Gallo acquiescing in Pernod's demands,
> which required Gallo discontinuing use of
> existing packaging and inferentially removing
> the allegedly infringing packaging from the
> marketplace within the 30 day demand period.
> Although the letter did not expressly say:
> 'comply or be sued,' the statement that
> Pernod would not 'tolerate' continued use and
> Pernod's express reference to Gallo's alleged
> violations of the Lanham Act, coupled with
> the aggressive deadlines imposed on Gallo to
> comply, provide ample basis for an
> objectively reasonable belief that litigation

would follow if Gallo did not comply.

> As in *Chesebrough*, Gallo and Pernod are competitors in the same market for 'coolers.' Pernod's letter accused Gallo of infringing Pernod's trademark by creating confusion among 'cooler' consumers. Pernod's lack of response to Gallo's subsequent emails is inconsistent with an attempt to amicably resolve the dispute. Pernod made no attempt to dispel any of Gallo's fears that Gallo faced an intractable demands [sic] and imminent infringement action if it did not meet the deadlines Pernod had imposed. When counsel for Gallo requested further information, Pernod's counsel simply referred him back to Pernod's original letter and stated that Pernod's investigation as to specific instances of consumer confusion was ongoing. When Gallo's counsel requested additional time to provide a substantive response, Pernod refused to modify its deadline. Under the principles of *Societe de Conditionnement*, the initial Pernod letter, the subsequent email exchange between the parties, and Pernod's unyielding conduct, which did not invite or suggest a standstill while the status quo was maintained, gave Gallo a reasonable apprehension that an infringement action by Pernod was imminent.

2006 WL at * 8-9. Pernod's reliance on *Dunn Computer Corp. v. Loudcloud, Inc.*, 133 F.Supp.2d 823 (E.D.Va 2001) was disregarded in resolving the motion to dismiss because "in this circuit *Societe de Conditionnement* and its progeny are binding authority" and because the plaintiff in *Dunn* "filed a three count complaint eight days after receiving the letter without so much as responding to the letter or contacting defendant." *Id.* at * 7 n.2.

General Wire argues that *Dunn Computer Corp. v. Loudcloud* is not distinguishable from the allegations in this action and

should be applied to require dismissal of the Sixth Cause of
Action.

In *Dunn Computer*, the cease and desist letter sent by Dunn
Computer to Loudcloud stated in pertinent part:

> It has come to our attention that your
> company recently began using the trademark
> STEELCLOUD for services similar to those of
> Loudcloud, which you market to the same class
> of customers as Loudcloud .... Your company
> competes directly with Loudcloud in providing
> packaged back-end services for businesses
> engaged in e-commerce, including the
> provision of hardware, software, systems
> analysis and expert consultation services
> ....
>
> The STEELCLOUD mark is confusing similar to
> LOUDCLOUD.  In addition to the identical
> 'CLOUD' portion, 'LOUD' and 'STEEL' both
> connote power and strength .... Consequently,
> your company's adoption of STEELCLOUD is
> likely to cause confusion in the marketplace
> and therefore constitutes a violation of our
> client's rights in its trademark LOUDCLOUD.
>
> In short, your adoption of STEELCLOUD is
> likely to confuse the public and dilute the
> strength of the LOUDCLOUD mark; it is thus a
> violation of Loudcloud's rights under federal
> and state trademark and unfair competition
> laws.  We therefore demand that your company
> immediately:
>
> 1.  Cease and desist all use of the trade
> name, company name and trademark STEELCLOUD
> ...;
>
> 2.  Cease and desist all use of the Internet
> domain name 'steelcloud.com' ..., and assign
> any such domain names to Loudcloud;
>
> 3.  Publish ... a corrective notice, and
> issue a press release, stating that neither
> your company, nor its products or services,
> are in any way affiliated with, sponsored or
> endorsed by Loudcloud, Inc., and that you
> have ceased all use of the STEELCLOUD mark.

40

1          Our client considers protection of its
           intellectual property to be a critical part
2          of its business.  It has already successfully
           persuaded the owners of the marks
3          THUNDERCLOUD and LAUNCHCLOUD to change their
           names.  We hope you will amicably agree to do
4          the same.

5          We look forward to your response on or before
           October 27, 2000, indicating your compliance
6          with the demands of this letter.

7  133 F.Supp.2d at 825-826.  The district court held in pertinent

8  part:

9          Analysis ... properly begins with whether
           plaintiff's apprehension of being sued by
10         defendant was objectively real and
           reasonable.  Put another way, this prong is
11         established 'if defendant's actions create in
           plaintiff a "reasonable apprehension" of
12         being sued for infringement.' ... And, the
           proper focus in this regard is on the
13         defendant's conduct and statements, because
           'apprehension alone, if not inspired by
14         defendant's actions, does not give rise to an
           actual controversy.' Furthermore, while
15         direct evidence of threatening contacts
           initiated by the defendant or a background of
16         litigation between the parties is strong
           evidence of a reasonable apprehension of
17         litigation, an objectively reasonable
           apprehension of imminent litigation must be
18         determined from the totality of the
           circumstances.
19
           These principles, applied here, point
20         persuasively to the absence of a case or
           controversy, as the record falls short of
21         establishing an objectively reasonable
           apprehension of imminent litigation.  Simply
22         put, one cease and desist letter does not a
           case or controversy make where, as here, that
23         letter invites negotiation, but does not
           explicitly threaten litigation, and was
24         defendant's sole act directed at plaintiff.
           These meager facts fall short of the
25         constitutional case or controversy threshold.
           More is required.  Specifically, courts
26         finding a case or controversy in analogous

41

circumstances have relied on various
additional factors, including:

> (i) a cease-and-desist letter
> threatening litigation and setting
> forth the elements of a prima facie
> claim of trademark infringement
> against the declaratory judgment
> plaintiff;

> (ii) a cease-and-desist letter
> coupled with formal opposition of
> the declaratory judgment
> plaintiff's trademark application
> to the PTO;

> (iii) a response to the filing of a
> declaratory judgment action that
> includes a counterclaim for
> trademark infringement;

> (iv) a cease-and-desist letter
> followed by a failed attempt to
> settle the dispute prior to
> initiating litigation;

> (v) a cease-and-desist letter
> coupled with ongoing litigation
> between the parties.

None of these additional factors is present
here.  First, while defendant's letter
references the likelihood of confusion
standard - the basis of a trademark
infringement suit - defendant has not and
cannot state a prima facie case of federal
trademark infringement because defendant has
no registered trademarks on which to rely.
Second, defendant has not filed a
counterclaim in the instant action.  Finally,
the cease-and-desist letter indicated
defendant's desire to settle and invited
plaintiff to respond to the letter.  These
facts are insufficient to create a reasonable
apprehension of an imminent suit for
trademark infringement.

133 F.Supp.2d at 827-828.

General Wire's reliance on *Dunn Computer* is misplaced and

the motion to dismiss the Sixth Cause of Action is DENIED.  This court is not bound by any decision of another district court. General Wire's cease and desist letter does not invite negotiation but, rather, specifically states,  "Please be advised that if Vision does not immediately cease and desist from their unlawful practices, we will seek all appropriate legal remedies, without prior notification."  General Wire also states: a) "we demand that Vision cease and desist from engaging in any further misleading and illegal practices ...."; b) "[p]lease confirm, in writing, Vision's intention to comply with this demand no later than ten business days from the date of this correspondence"; c) "General Wire will treat Vision's failure to cease and desist ... as a further breach of the aforementioned Settlement Agreement, thereby solidifying General Wire's ability to send correspondence, similar to this one, to entities such as Rycom ...."  Although General Wire argues that the cease and desist letter was not coupled with ongoing litigation, the reference in the cease and desist letter to the "Settlement Agreement" between the parties implies that there has been litigation between General Wire and Vision Tech in the fairly recent past.  As in *E.& J. Gallo Winery*, all these demands and threats demonstrate that Vision Tech had a real and reasonable apprehension that it will be sued and subject to liability if it fails to comply with General Wire's demands.  An actual case or controversy exists between it and General Wire for purposes of the Declaratory Judgment Act.

43

## CONCLUSION

For the reasons stated above,

1.   General Wire's motion to dismiss is GRANTED IN PART WITH LEAVE TO AMEND AND DENIED IN PART.

2.   Counsel for GENERAL WIRE shall prepare and lodge a form of order that reflects the specific rulings on each issue addressed by this decision within five (5) days following the date of service of this decision.

3.   Within ten (10) days of the filing of the Order, Vision Tech shall file a First Amended Complaint in compliance with the rulings set forth herein.

IT IS SO ORDERED.

Dated:   __July 13, 2007__                    _____/s/ Oliver W. Wanger_____
                                              UNITED STATES DISTRICT JUDGE