IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISION TECHNOLOGY DESIGN AND MANUFACTURING, INC., <br><br> Plaintiff, <br><br> vs. <br><br> GENERAL WIRE SPRING CO., <br><br> Defendant. | No. CV-F-07-412 OWW/GSA <br><br> MEMORANDUM DECISION AND ORDER GRANTING IN PART WITH LEAVE TO AMEND AND DENYING IN PART PLAINTIFF'S TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR MORE DEFINITE STATEMENT OR TO STRIKE COUNTERCLAIM (Doc. 54) |

Plaintiff Vision Technology Design and Manufacturing, Inc. (Vision Tech) is proceeding pursuant to a Second Amended Complaint (SAC) against General Wire Spring Company (General Wire) and Arthur Silverman, Chief Executive Officer of General Wire.

On February 25, 2008, General Wire and Silverman filed an "Answer, Affirmative Defenses, and Counterclaim in Response to Plaintiff's Second Amended Complaint for Damages and Declaratory Relief" (Answer/Counterclaim). The caption of the

Answer/Counterclaim names General Wire and Silverman as "Defendants and Third-Party Plaintiffs" and names Jack Felix as "Third-Party Defendant."

**A.  MOTION TO DISMISS.**

Vision Tech moves to dismiss the Counterclaim on various grounds.

**1.  Governing Standards.**

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001). "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.,* 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombley*, ___ U.S. ___, 127 S.Ct. 1955, 1974 (2007). "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, *id.* at 1964-1965. Dismissal of a claim under Rule 12(b)(6) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Dismissal is warranted under Rule 12(b)(6) where the

2

complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984). In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).

Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint. *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Parrino v. FHP, Inc*., 146 F.3d 699, 705-706 (9th Cir.1988).

        2. <u>Vision Tech Not Named as Party in Caption</u>.

Vision Tech argues that dismissal of the Counterclaim is required pursuant to Rules 12(b)(1) and (b)(6), Federal Rules of Civil Procedure, because Vision Tech is not named as "a party defendant to the Counterclaim per the case caption." Vision Tech

1  acknowledges that this may have been a clerical error, but that
2  it "cannot safely presume that it was such."
3      General Wire responds that the Counterclaim asserts claims
4  for breach of contract, fraud, violation of General Wire's
5  intellectual property rights, and breach of fiduciary duties
6  "against Vision Tech, an original party in this case" and that
7  they "have clearly advanced third party claims for fraud and
8  breach of fiduciary duties against Vision Tech's President and
9  majority shareholder, Felix."  General Wire states that, to the
10 extent deemed necessary by the Court, they will amend the caption
11 of the Answer/Counterclaim to "include Vision Tech as a third-
12 party defendant."
13     Because dismissal with leave to amend is granted on other
14 grounds, *see discussion infra,* General Wire is ordered to amend
15 the caption to allege all of the parties to the Counterclaim.
16          3.   <u>Failure to Plead Fraud with Specificity</u>.
17     Vision Tech moves to dismiss Count II of the Counterclaim
18 for fraud against Vision Tech and Felix on the ground that the
19 fraud is not plead with the specificity required by Rule 9(b),
20 Federal Rules of Civil Procedure.
21     Count II of the Counterclaim alleges:
22          123. General Wire incorporates paragraphs 1
                through 122 as if the same were set forth at
23              length.
24          124. General Wire is informed and believes,
                and thereon alleges, that Jack Felix
25              ("Felix") is and was a resident of the State
                of California, and General Wire is informed
26              and believes that Felix was, at all times

4

mentioned herein, President of Vision Tech.

125. Near the inception of the parties' relationship, General Wire entered into a lending agreement with Vision Tech in the approximate amount of $400,000.

126. Specifically, General Wire loaned Vision Tech $400,000 in exchange for Vision Tech's participation in the design and manufacture of General Wire's Gen-Eye 3 ("G3").

127. At the time in which General Wire made the $400,000 loan to Vision Tech, General Wire desired a camera system for the machines that it, with the assistance of its prior supplier, had developed, had secured manufacturing, and was actively selling to its customers, which was capable of replacing, and being interchangeable with, the G3's predecessor, *i.e.*, General Wire's Gen-Eye 2 ("G2").

128. When General Wire approached Vision Tech regarding its participation in the design and manufacture of a camera system for General Wire's G3, General Wire, following discussions with representatives of Vision Tech, including Felix, determined that Vision Tech's existing camera system was insufficient for purposes of succeeding the G2 and functioning as a component of the G3.

129. Accordingly, the parties were required to develop a completely new camera system, which became incorporated into General Wire's G3 for General Wire.

130. Vision Tech, including Felix, at all relevant times, knew, understood, and represented that the parties' lending agreement required Vision Tech to utilize the $400,000 in designing and manufacturing General Wire's G3.

131. Vision Tech, including Felix, at all relevant times, further knew, understood, and represented that any benefits, including any intellectual property rights, which derived from the design and manufacture of General Wire's G3, or any other offering from the

Gen-Eye product line (*e.g.*, General Wire's Gen-Eye Junior), would be attributable to, and inure to the benefit of, General Wire.

132. Additional misrepresentations by Vision Tech, including Felix, included, but were not limited to, the following: representations or omissions regarding the financial stability of Vision Tech; representations or omissions regarding Felix's divorce, as well as the manner in which the same affected Vision Tech's financial stability; representations or omissions regarding General Wire's development of its Gen-Eye product line; representations or omissions regarding Vision Tech's improper and unilateral pricing strategies; representations or omissions regarding Vision Tech's inability to continue production of the G3-500 command modules.

133. In short, in exchange for Vision Tech's receipt of $400,000 from General Wire, General Wire was entitled to Vision Tech's good faith participation in the design and manufacture of General Wire's products, as well as any benefits that derived from the parties' development of the same.

134. Notwithstanding the above representations of Vision Tech and Felix, Vision Tech, including Felix, at the time in which Vision Tech received funds from General Wire, including the initial $400,000 loan, never intended to (i) design and manufacture General Wire's products in good faith or (ii) permit General Wire to enjoy the benefits that derived from the parties' development of the same.

135. Rather, Vision Tech, including Felix, intended to defraud General Wire. Specifically, it is believed, and, therefore, averred, that Vision Tech and Felix, at no time, intended to assist General wire in the development of its products. Rather, Vision Tech, including Felix, intended to utilize the funds received from General Wire throughout its relationship to develop and promote Vision Tech's own products to the exclusion and detriment of General Wire and General Wire's customers.

**136. At the inception of the parties' relationship, representatives of Vision Tech, namely, but not solely, Felix, misinformed General Wire about the financial stability of Vision Tech.**

**137. Despite representations from Vision Tech, including Felix, that Vision Tech was a financially sound organization, Vision Tech's financial condition, in fact, was precarious.**

**138. As discovery in this case has revealed, such misrepresentations, in hindsight, are evidenced by the facts that Felix and Dena Beratlis, his wife and the granddaughter-in-law of Vision Tech financier Marshall Perry, unbeknownst to General Wire, were separated and going through a divorce, that Vision Tech was experiencing difficulties in paying its utility bills, and that Vision Tech was experiencing further difficulties in satisfying its payroll obligations.**

**139. In fact, Vision Tech actively concealed its precarious financial condition from General Wire in order to induce General Wire to enter into the loan agreement.**

**140. In entering into the loan agreement, Vision Tech, again unbeknownst to General Wire, intended to use its affiliation with General Wire, including, but not limited to, the $400,000, General Wire's goodwill, and General Wire's intellectual property, to resurrect its precarious financial condition, to reinvent Vision Tech as an organization, and to introduce a new product line that would mimic General Wire's products, including, but not limited to, the camera system that Vision Tech, in part, was to design and manufacture on behalf of General Wire.**

**141. All the while, however, Vision Tech misrepresented to General Wire that it was utilizing the $400,000 in designing and manufacturing General Wire's products, and that any benefits that derived from the parties' development of the same would be attributable to, and inure to the benefit of, General Wire.**

> **142. Further, Vision Tech continuously made such misrepresentations throughout the pendency of the lending agreement, which resulted in General Wire's subsequent advancements of additional monies to Vision Tech over and above the initial $400,000.**
>
> **143. Whereas General Wire, at all relevant times, believed that Vision Tech was manufacturing its products in good faith and honoring its agreement that any benefits derived from the same would be attributable to, and inure to the benefit of, General Wire, Vision Tech was defrauding General Wire by resurrecting its precarious financial condition, by reinventing Vision Tech, and by "developing," to the detriment of General Wire, a product line that replicated and ripped off General Wire's Gen-Eye product line.**
>
> **144. General Wire need not look any further than the declaration currently sought by Vision Tech in its most recent and Second Amended Complaint to highlight Vision Tech's fraud; Vision Tech seeks a declaration that would permit it to promote and sell the replica Gen-Eye products in violation of General Wire's intellectual property rights.**
>
> **145. Due to the fact that Vision Tech perpetrated a continuous fraud upon General Wire, beginning at the inception, and ending at the conclusion, of the parties' relationship, General Wire has sustained substantial damages and harm to its business.**

Vision Tech contends that it cannot meaningfully respond to these allegations because it "cannot tell what specific misrepresentations were allegedly made to whom, when, and where." Vision Tech further complains that the Counterclaim does not allege when "any such alleged misrepresentations were discovered or reasonably could have been discovered such that the statute of limitations would have begun to run."

8

Allegations of fraud must include the time, place, and nature of the fraudulent statements, including reasons why the statements are false. *In re Glenfed, Inc. Securities Litigation*, 42 F.3d 1541, 1547-48 (9th Cir. 1994) (en banc). "A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).

General Wire contends that the fraud claim is "particularly pled and legally sufficient." General Wire asserts that Rule 8, Federal Rules of Civil Procedure, requires notice pleading. General Wire cites *Carrigan v. California State Legislature*, 263 F.2d 560, 565 (9th Cir.), *cert. denied*, 359 U.S. 980 (1959):

> When fraud is alleged, it must be particularized as Rule 9(b) requires, but it still must be as short, plain, simple, concise, and direct, as is reasonable under the circumstances, and as Rules 8(a) and 8(e) require.

Vision Tech replies that *Carrigan* is not controlling. *Carrigan* involved a pro per plaintiff whose legal theories were alleged in twenty-seven pages of her complaint, the relief she demanded was specified in the last nine pages, and intervening 150 pages contained hundreds of hearsay conversations, letters, conclusions, self-serving statements, statements made by a non-party, and other matters. Vision Tech reiterates its position that Count II "fails to particularize the *circumstances constituting fraud, because it does not set forth the time, place

and nature of the alleged fraudulent activities."

The fraudulent misrepresentations are adequately described; however, the time and place of the alleged misrepresentations, and who made them, is not pleaded with the specificity required by Rule 9(b). Count II is DISMISSED WITH LEAVE TO AMEND.

3. <u>Failure to Adequately Plead Violation of Intellectual Property Rights</u>.

Vision Tech moves to dismiss Count III of the Counterclaim for violation of intellectual property rights as "legally insufficient and hopelessly vague."

Count III alleges:

> 146. General Wire incorporates paragraphs 1 through 145 as if the same were set forth at length.
>
> 147. When General Wire approached Vision Tech regarding its participation in the design and manufacture of General Wire's G3, General Wire, following discussions with Vision Tech, determined that Vision Tech's existing product offering, namely, its former Intruder, was insufficient for purposes of succeeding the G2 and functioning as the G3.
>
> 148. Specifically, Vision Tech's former Intruder, including its camera system, was not compatible with General Wire's G2 and lacked more sophisticated and desirable features.
>
> 149. Accordingly, the parties developed a completely new camera system for General Wire's G3.
>
> 150. In connection with Vision Tech's participation in the design and manufacture of General Wire's G3, Vision Tech, on a confidential basis and in consideration of the representations and warranties made by Vision Tech, including, but not limited to,

those set forth in the above paragraphs, was exposed to protected, improved, and more efficient production processes, supply chain efficiencies, trade secrets, confidential drawings, and other materials associated with General Wire's Gen-Eye product line, including its G3 and Gen-Eye Junior.

151. The production processes, supply chain efficiencies, trade secrets, confidential drawings, and other materials formerly employed by Vision Tech, prior to its affiliation with General Wire, were less efficient.

152. General Wire's protected, improved, and more efficient production processes, supply chain efficiencies, trade secrets, confidential drawings, and other materials generated, and continue to generate, independent economic value for General Wire.

153. Further, but for Vision Tech's affiliation with General Wire, Vision Tech would not have been privy to General Wire's protected, improved, and more efficient production processes, supply chain efficiencies, trade secrets, confidential drawings, and other materials.

154. Notwithstanding Vision Tech's manipulation of its affiliation with General Wire, Vision Tech, upon information and belief, used, and continues to use, General Wire's protected, improved, and more efficient production processes, supply chain efficiencies, trade secrets, confidential drawings, and other materials in fabricating its new Intruder product line, including its Intruder and Intruder Elite.

155. Vision Tech's current use of General Wire's protected, improved, and more efficient production processes, supply chain efficiencies, trade secrets, confidential drawings, and other materials is improper. Further, Vision Tech recognizes, or reasonably should recognize, such impropriety.

156. Vision Tech's improper use of General

Wire's protected, improved, and more efficient production processes, supply chain efficiencies, trade secrets, confidential drawings, and other materials amounts to Vision Tech's misappropriation of a trade secret originating with, and belonging to, General Wire.

157. In addition, Vision Tech's promotion and sale of its new Intruder product line, including its Intruder and Intruder Elite, amounts to unfair competition with General Wire's original machines.

158. Vision Tech, through the use of deceptive and confusing practices, is offering copycat Gen-Eye products, *i.e.*, its new Intruder product line, in violation of General Wire's intellectual property rights.

159. In short, Vision Tech, as a result of its affiliation with General Wire, has "developed," through its anti-competitive means and to the detriment of General Wire, a "new" product line, *i.e.*, its new Intruder product line, which replicates and rips off General Wire's Gen-Eye product line.

160. Vision Tech's new Intruder product line closely resembles General Wire's Gen-Eye product line in matters of form and function, including look and feel.

161. In fact, Vision Tech's new Intruder product line merely contains slight color and housing modifications and a name change when compared with General Wire's original machines.

162. Further, Vision Tech's Intruder product line includes component parts that were specifically designed and manufactured by General Wire for inclusion in its Gen-Eye product line.

163. Vision Tech's new Intruder product line also includes instruction labels that were specifically developed by General Wire for inclusion in its Gen-Eye product line.

164. Accordingly, Vision Tech is unfairly

12

|   |   |
|---|---|
| 1 | competing with General Wire through its |
|   | deceptive and confusing offering of its |
| 2 | Intruder product line. |
| 3 | 165. Due to the fact that Vision Tech |
|   | infringed upon General Wire's intellectual |
| 4 | property, General Wire has sustained |
|   | substantial damages to its business and |
| 5 | reputation. |

Vision Tech complains that the "more efficient production processes, supply chain efficiencies, trade secrets, confidential drawings, and other materials associated with General Wire's Gen-Eye product line" alleged in Paragraph 150 are not described with any particularity; that Count III does not specify whether the claim is brought under federal or state law; does not allege how confidentiality was maintained; does not allege how independent economic value to General Wire resulted from maintaining reasonable secrecy; and does not allege "when any particular allegedly protected intellectual property was misappropriated and when that was discovered, nor is it alleged when any unfair competition occurred."  Vision Tech contends that Count III "is simply too vague to state a claim upon which relief can be granted."

Two of the cases cited by Vision Tech in support of this ground for dismissal of Count III for failure to state a claim involved summary judgment. *See Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-1165 (9th Cir.1998); *Intermedics, Inc. v. Ventritex, Inc.*, 822 F.Supp. 634, 643 (N.D.Cal.1993). *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F.Supp. 1303 (N.D.Cal.1997) did involve resolution of a motion to dismiss for

13

failure to state a claim but does not discuss pleading requirements for a claim of violation of intellectual property rights. Vision Tech's ground for dismissal is not supported by its cited authority.

Vision Tech relies on cases involving summary judgment standards, not Rule 12(b)(6) standards. Further, a plaintiff is not required to plead around affirmative defenses, including the statute of limitations. *Neveu v. City of Fresno*, 392 F.Supp.2d 1159, 1174 (E.D.Cal.2005), citing *Hyatt Chalet Motels, Inc. v. Carpenters Local 1065*, 430 F.2d 1119, 1120 (9th Cir. 1970). From the Counterclaim it is ascertainable that General Wire claims that it has trade secrets arising from its surveillance product and related business methodology. The claim invokes no federal law and must be based on state law unfair competition law. Discovery will reveal whether any viable defense exists to prevent such a claim. The motion to dismiss is DENIED.

    4.  <u>Failure to Adequately Plead Breach of Fiduciary Duty</u>.

Vision Tech moves to dismiss Count IV of the Counterclaim alleging "Breach of Fiduciary Duties (Arthur Silverman's Minority Shareholder Claim)". Count IV is alleged against Vision Tech and Felix.

Count IV alleges:

> 166. Silverman incorporates paragraphs 1 through 165 as if the same were set forth at length.
>
> 167. Near the inception of the parties'

14

relationship, Arthur Silverman personally invested $20,000 in Vision Tech.

168. Arthur Silverman's individual investment in Vision Tech entitled him to a 10% ownership interest in Vision Tech, thereby making him a minority shareholder.

169. In connection with his investment, Arthur Silverman received, *inter alia*, a seat, albeit minority seat, on Vision Tech's Board of Directors, a commitment from Vision Tech regarding its promise to forego obligating the corporation financially without Arthur Silverman's prior approval, and complete access to information, including, but not limited to, financial information, regarding Vision Tech's cash flow condition and operations in general.

170. As a minority shareholder, Arthur Silverman, importantly, was entitled to the enjoyment of fiduciary duties, including the duties of due care, loyalty, and good faith, from Vision Tech's officers, directors, and majority and controlling shareholders, including Jack Felix.

171. Jack Felix and Vision Tech, however, breached their duties of due care, loyalty, and good faith to Arthur Silverman, generally, and in the following nonexclusive particulars:

   a. By failing to provide Arthur Silverman with information to which he was entitled to receive;

   b. By actively concealing, from Arthur Silverman, information to which he was entitled to review;

   c. By failing to keep Arthur Silverman apprised of decisions to which he was entitled to consider and participate;

   d. By failing to distribute, in the form of dividends or otherwise, monies to which Arthur Silverman was entitled to appreciate;

15

> e. By squeezing Arthur Silverman out of Vision Tech in his capacities as minority shareholder and director;
>
> f. By engaging in certain self-dealings;
>
> g. By defrauding the corporation to which Arthur Silverman serves as Chief Executive Officer, *i.e.*, General Wire;
>
> h. By infringing upon the intellectual property of the corporation to which Arthur Silverman serves as Chief Executive Officer, *i.e.*, General Wire;
>
> i. By unfairly competing against the corporation to which Arthur Silverman serves as Chief Executive Officer, *i.e.*, General Wire.
>
> 172. Such activity on behalf of Jack Felix and Vision Tech was improper and neither supported by, nor grounded in, a legitimate business purpose of Vision Tech.
>
> 173. As a majority and controlling shareholder, Jack Felix, as well as Vision Tech, in general, owed Arthur Silverman uncompromising duties of due care, loyalty, and good faith.
>
> 174. Jack Felix and Vision Tech, however, completely compromised, without question, their fiduciary duties to Arthur Silverman.
>
> 175. Due to the fact that Jack Felix and Vision Tech compromised their fiduciary duties to Arthur Silverman, Arthur Silverman has sustained damages.

Vision Tech moves to dismiss Count IV as alleged against it, contending that a claim of a majority shareholder's breach of fiduciary duty does not lie against the corporation, but only against a controlling or dominant shareholder.

General Wire does not discuss this ground for dismissal in its opposition. Although it seems self-evident that a claim for breach of fiduciary duty cannot be alleged against the corporation, the cases cited by Vision Tech do not specifically so hold. Nonetheless, because General Wire does not contest this ground for dismissal of Count IV, the motion is GRANTED WITH PREJUDICE as against Vision Tech.

Vision Tech further moves to dismiss Count IV on the ground that "Subparagraphs 171(a)-(f) are highly vague and conclusory." Vision Tech contends that "Paragraph 171(g)-(i) alleges not that Silverman was mistreated, but that [General Wire] was!" Vision Tech argues that these allegations should be dismissed because it is not alleged that General Wire was a minority shareholder of Vision Tech.

General Wire responds that the allegations of Count IV satisfy the pleading requirements and that Vision Tech's assertions are belied by their ability to paraphrase what is alleged.

Because General Wire was not a shareholder in Vision Tech, it does not appear that Felix owed Vision Tech a fiduciary duty. Otherwise, Count IV suffices to state a claim upon which relief can be granted, given the governing standards. The motion to dismiss is GRANTED IN PART AND DENIED IN PART

**B.   MOTION FOR MORE DEFINITE STATEMENT AND TO STRIKE.**

If the motion to dismiss is not granted, Vision Tech moves for a more definite statement on the grounds that the claims for

fraud, violation of intellectual property rights, and breach of majority shareholder fiduciary duty are so vague and ambiguous that Vision Tech and Felix cannot reasonably prepare a response.

"Under the liberal pleading standards, 'pleadings in federal courts are only required to fairly notify the opposing party of the nature of the claim.'"  *City of South Pasadena v. Slater*, 56 F.Supp.2d 1095, 1105 (C.D. Cal. 1999).  Federal Rule of Civil Procedure 12(e) provides:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading.  The motion shall point out the defects complained of and the details desired.  If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

A Rule 12(e) motion for a more definite statement must be considered in light of Rule 8's liberal pleading standards in federal court.  *See, e.g.*, *Bureerong v. Uvawas*, 922 F.Supp 1450, 1461 (C.D. Cal. 1996) (citing *Sagan v. Apple Computer, Inc.*, 874 F.Supp. 1072, 1077 (C.D. Cal. 1994) ("Motions for a more definite statement are viewed with disfavor and are rarely granted because of the minimal pleading requirements of the Federal Rules.")).

A Rule 12(e) motion is proper only if the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted, *i.e.*, so vague that the defendant cannot

begin to frame a response.  *See Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525 F.Supp. 940, 949 (E.D. Cal. 1981) (citing *Boxall v. Sequoia Union High Sch. Dist.*, 464 F.Supp 1104, 1114 (N.D. Cal. 1979)).  The Court must deny the motion if the complaint is specific enough to notify defendant of the substance of the claim being asserted.  *See Bureerong*, 922 F.Supp. at 1461; *see also San Bernardino Pub. Employees Ass'n v. Stout*, 946 F.Supp. 790, 804 (C.D. Cal. 1996) ("A motion for a more definite statement is used to attack unintelligibility, not mere lack of detail, and a complaint is sufficient if it is specific enough to apprise the defendant of the substance of the claim asserted against him or her.")

The Court may also deny the motion if the detail sought by a motion for more definite statement is obtainable through discovery.  *See Davidson v. Santa Barbara High Sch. Dist.*, 48 F.Supp.2d 1225, 1227 (C.D. Cal. 1998).  "Thus, the class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small—the pleading must be sufficiently intelligible for the court to be able to make out one or more potentially viable legal theories on which the claimant might proceed, but it must not be so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself."  Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (2d ed.) §1376.

Whether to grant a Rule 12(e) motion for a more definite statement lies within the wide discretion of the district court.

1  *See id.* §1377.  However, "[m]otions for more definite statement
2  are viewed with disfavor, and are rarely granted."  William W.
3  Schwarzer, A. Wallace Tashima, and James M. Wagstaffe, Federal
4  Civil Procedure Before Trial §9:351 (2000) (citing *In re American
5  Int'l Airways, Inc.*, 66 B.R. 642, 645 (E.D. Pa. 1986)).
6      Given these standards, the motion for more definite
7  statement is DENIED.
8      Vision Tech further moves to strike Count IV as alleged
9  against Vision Tech and to strike Paragraph 171(g)-(i) on the
10 ground that General Wire is not a shareholder in Vision Tech.
11 Because dismissal of Count IV is granted as against Vision Tech
12 and because it does not appear that General Wire has a claim
13 against Felix for breach of fiduciary duty, Vision Tech's motion
14 to strike is DENIED AS MOOT.

                              CONCLUSION

16      For the reasons stated above:
17      1.  Vision Tech's motion to dismiss is GRANTED IN PART LEAVE
18 TO AMEND AND DENIED IN PART;
19      2.  Vision Tech's motion for more definite statement is
20 DENIED;
21      3.  General Wire shall file an amended Counterclaim within
22 20 days of the filing date of this Memorandum Decision and Order.
23
24 IT IS SO ORDERED.
25 Dated:   July 7, 2008                /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE
26